IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

ANTHONY BEASLEY,

              Defendant.

CRIMINAL ACTION
NO. 20-361

## OPINION

Slomsky, J.                                                    September 14, 2023

### TABLE OF CONTENTS

I.      **INTRODUCTION** ................................................................................................. 4

II.     **FINDINGS OF FACT** ......................................................................................... 4

  **A.**  **Background** ....................................................................................................... 4

  **B.**  **Execution of Search Warrant** .................................................................... 6

  **C.**  **Interrogation of Defendant Commences** ................................................ 8

  **D.**  **Evidence Gathered by the Agents** ........................................................ 10

  **E.**  **Defendant's Emotions During the Interrogation** ............................. 16

  **F.**  **Defendant's Invocation of his Right to Counsel** ............................... 17

    1.   First Invocation Regarding Counsel ......................................................... 18

    2.   Second Invocation Regarding Counsel ..................................................... 18

    3.   Third Invocation Regarding Counsel......................................................... 18

    4.   Fourth Invocation Regarding Counsel....................................................... 19

    5.   Fifth, Sixth, and Seventh Invocations Regarding Counsel ................ 19

**III.   CONCLUSIONS OF LAW** ................................................................................... 22

  **A.  Introduction** ............................................................................................... 22

   1.   Miranda Warnings ................................................................................ 22

   2.   Miranda Warnings and the Custodial Interrogation Requirement ........... 25

  **B.  Circumstances Surrounding the Investigation** ........................................... 30

   1.   Pre-Interview ....................................................................................... 30

   2.   Interrogatories ...................................................................................... 30

   3.   Post-Interview ...................................................................................... 32

  **C.  Whether a Reasonable Person Would Have Felt at Liberty to Terminate**

     **the Interrogation and Leave** .................................................................... 33

   1.   The Interview's Location, Physical Surroundings, and Duration ............ 33

     i. Location and Physical Surroundings ……………………………….…………33

     ii. Duration.………………………………………………………………….......37

   2.   Voluntary Participation ......................................................................... 38

   3.   Physical Restraint .................................................................................. 38

   4.   Officer's Expression of Belief ............................................................... 39

   5.   Whether Officers Told Suspect He was Under Arrest or Free to Leave ... 43

   6.   Whether Officers Used Coercive Tactics ............................................... 44

   7.   Whether the Interviewee was Released .................................................. 45

**D. Whether the Freedom-of-Movement Test Presents the Same Inherently**

**Coercive Pressures as Miranda** ........................................................................... 46

**E.   Constitutional Right to Counsel** ................................................................ 47

**F.   Coercion** ......................................................................................................... 50

**IV.   CONCLUSION** ...................................................................................................... 54

## I.     INTRODUCTION

Before the Court is Defendant Anthony Beasley's Motion to Suppress [His] Statement (the "Motion").  (Doc. No. 70.) He asserts that his interrogation by agents of the Federal Bureau of Investigation ("FBI") held in his home violated his Fifth Amendment rights.  Specifically, he argues that: (1) he did not receive <u>Miranda</u> warnings before his custodial interrogation, (2) his request for counsel was disregarded, and (3) his statements were the result of coercive investigative tactics.  Defendant seeks suppression of the statements made during the questioning and all fruits derived from the statements.

The Government filed an Omnibus Response in Opposition (Doc. No. 80) and the Court held a hearing on all pre-trial motions, including Defendant's Motion to Suppress, on January 25, 2023.  (Doc. No. 88.)  On May 8, 2023, Defendant filed a Supplemental Memorandum.  (Doc. No. 97.)  On May 26, 2023, the Government filed its Response in Opposition to the Supplemental Memorandum in Support of the Motion to Suppress.  (Doc. No. 102.)  For reasons that follow, the Court finds that the questioning of Defendant by the agents was done in a manner that violated Defendant's rights under the Fifth Amendment to the United States Constitution.  Accordingly, Defendant's Motion to Suppress [His] Statement (Doc. No. 70) will be granted.

## II.     FINDINGS OF FACT

### A.  <u>Background</u>

Defendant Anthony Beasley is charged by a grand jury with violating: (1) 18 U.S.C. § 2552(a)(2), Distribution of Child Pornography (Count I); (2) 18 U.S.C. § 2552(a)(4)(B), (b)(2), Possession of Child Pornography (Count II); (3) 18 U.S.C. § 2551(d)(1)(A), Advertisement or Publishing of Child Pornography (Count III); and (4) 18 U.S.C. § 2552(a)(2), Receipt of Child Pornography (Count IV).  (Doc. No. 22 at 1, 3-5.)  These charges stem from Defendant's online

activity in which he allegedly used social media to receive, possess, distribute, and publish child pornography.  (Id.; Doc. No. 92 at 11:17-22.)

Prior to the interview that is the subject of the Motion to Suppress, the FBI received seven "CyberTipline reports" from Twitter and information from the National Center for Missing and Exploited Children, which identified seven Twitter accounts with variations on the name boyzcuties.  (Doc. No. 1 ¶ 6(a)-(g); Doc. No. 92 at 11:10-14, 23-25.)  Upon investigation, the Case Agent[1] found images of child pornography in these reports.  (Doc. No. 1 ¶ 8.)  The Case Agent also reviewed one of the boyzcuties Twitter accounts, which had posted on it "numerous videos," a "Kik Messenger username,"[2] and advertisements of "longer versions of these videos available for sale."  (Id. ¶ 10; Doc. No. 92 at 13:8-20.)

Subsequently, an undercover FBI agent contacted the owner of this Twitter account through Kik, purchased one of the advertised videos, and did so using PayPal.  (Doc. No. 1 ¶ 11; Doc. No. 92 at 13:21-25; 14:1-23.)  The "PayPal payment receipt show[s] the payment went to an individual named Anton Beasley."  (Doc. No. 1 ¶ 12.)  The video sent to the agent depicted child pornography.  (Id. ¶ 13; Doc. No. 92 at 14:21-25; 15:1-2.)  Consequently, the FBI sent administrative subpoenas to various companies to identify the Twitter user posting child pornography files.  (Doc. No. 1 ¶ 14.)  The subpoenas showed that an Anton Beasley was associated with 1223 South 21st Street, Philadelphia, PA 19146, as well as three other Philadelphia addresses.  (Id.)  Additionally, subpoenas sent to Yahoo and PayPal disclosed two Verizon IP addresses which were also

---

[1]   A "Case Agent" has a primary responsibility for the criminal investigation and/or case assigned to him or her and oversees the investigative process, including drafting investigative reports, conducting surveillance and coordinating evidence.

[2]   Kik Messenger "is a smart phone application that allows for private and group chats and allows users to send and receive pictures and videos from other Kik users."  (Doc. No. 1 ¶ 10.)

"assigned to the subscriber Anton Beasley, 1223 South 21st Street, Philadelphia, PA 19146." (Id. ¶ 15; Doc. No. 92 at 16:2-10.) The Case Agent received information regarding these IP addresses and their corresponding identity and address in response to the administrative subpoenas. Equipped with this knowledge, the Case Agent sought, and was granted, a federal search warrant to search Defendant's home. (Doc. No. 1 ¶ 20; Doc. No. 92 at 18:12-18.)

B. Execution of Search Warrant

The search warrant was executed on January 30, 2020 at 6:45 a.m. (Doc. No. 92 at 18:23-25.) The Case Agent testified during a hearing on the Motion to Suppress that 6:45 a.m. was selected because "[t]ypically, that's when individuals are still at their residence and still at home early in the morning." (Id. at 46:16-17.)[3] Acting pursuant to a warrant, ten agents, each of whom carried a firearm, entered the premises. (Id. at 46:19-25; 47:1-4; 48:2-10.) Upon arriving at Defendant's suspected place of residence, 1223 South 21st Street, Philadelphia, PA, the agents "knocked and announced [their] presence" as well as their possession of a search warrant for the home. (Id. at 19:3-6.) Malcolm Greer, Defendant's roommate, opened the door. (Id. at 20:16-23.) Defendant was observed walking by the doorway and then climbing stairs. (Id. at 20:16-23; 21:1-2.)

This initial interaction between Defendant and the Agents was discussed during the recorded interview as follows:

> Defendant: You know, when y'all was knocking on the door and I was gonna go back upstairs.
>
> The Case Agent: Yeah, that was not a smart move.

---

[3] The evidence presented at the hearing held on January 25, 2023 on the Motion to Suppress [Defendant's] Statement consisted of the testimony of the Case Agent and a recording of the interview. The questioning of Defendant commenced at 6:45 a.m. and ended at 8:38 a.m.

The Second Agent[4]: Yeah, that would've been bad.

The Case Agent: That would've been bad for you.

Defendant: Well, yeah, well he said he yelled at me and said don't go upstairs.

The Case Agent: Yeah, he was smart.

Defendant: If I went all the way upstairs, I may have been, in what, in handcuffs or something, you know.

The Case Agent: It would have been bad for you.  Yes.  Because . . .

Defendant: Cause you're not cooperating.

The Second Agent: Right.

The Case Agent: Well, we don't know, at that point. . .

The Second Agent: If you're you going up there to get a weapon.

The Case Agent: We don't know what's gonna happen.

Defendant: Oh yeah, right.

. . .

The Case Agent: If, if, if that dog wasn't there, and I, I saw what you were doing is going up them steps, we would've come through that door a lot quicker.  But that was smart for you to stop at the bottom of the stairs.

The Second Agent: Yeah, that was the smartest thing.

The Case Agent: That was extremely smart.

(Interview Tr. at 37:31-32, 34, 36, 38, 40, 42, 44-45; 38:1, 3, 5, 7, 9, 11, 13, 23-25, 27, 29.)

The Case Agent entered the home, approached Defendant, and "grabbed" his arm.  (Doc. No. 92 at 21:7-9.)  The Case Agent told him that he needed to remain downstairs while they conducted a protective sweep of the home.  (Id. at 21:2-12, 23-25.)  Defendant sat in the living

---

[4]    A second FBI Agent was present during the interrogation ("The Second Agent.")

room with several agents, including the Case Agent, while other agents conducted the protective sweep.  (Id. at 21:9-11; 22:1-9.)  As a federal officer, the Case Agent carried a firearm, which remained in his holster.  (Id. at 23:3-14.)  The Case Agent testified that while Defendant was not free to leave during the protective sweep or to move about the house, "if he indicate[d] that he want[ed] to leave [after the completion of the protective sweep], he would have left."  (Id. at 51:1-3, 6-9; 53:4-8.)  But at no time did the Case Agent tell Defendant that he was free to leave.  (Id. at 70:15-21.)[5]

After the home was secured, the Case Agent removed his ballistic vest, independently inspected the home, and spoke with his partner, the Second Agent, about where they would interview Defendant.  (Id. at 22:12-19, 23-25; 23:1.)

### C.   Interrogation of Defendant Commences

The agents informed Defendant that they had a search warrant and asked to speak with him.  (Doc. No. 92 at 24:13-18.)  The Case Agent described Defendant at this point as "calm" and that he "wanted to know why [they] were there."  (Id. at 24:19-23.)  The Case Agent testified that "if he [Defendant] would have said right from the start, I don't want to talk to you guys, we wouldn't have interviewed him."  (Id. at 25:6-8.)  Defendant agreed to speak with the agents.  (Id. at 25:11-12.)

---

[5]   During the Motions Hearing held on January 25, 2023, the following colloquy occurred:

The Court: Just one or two questions.  Did you advise at any time Mr. Beasley, [that] he was free to leave the house?

The Case Agent: No.  At the very beginning, we talked about his employment and if he had to go anywhere for work, but I never said like you're free to leave, just that he did not have [to] speak with us, and that he's not under arrest.

(Doc. No. 92 at 70:15-21.)

The interview took place in a second-floor bedroom; the room had a bed and dressers, but it did not have chairs.  (<u>Id.</u> at 25:13-18.)  The Case Agent described the room as "small" and containing a "bigger bed."  (<u>Id.</u> at 40:6-7.)  Defendant sat on the bed and the agents stood near a dresser.  (<u>Id.</u> at 25:19-25.)  The agents were "within a few feet" of Defendant, but they did not stand over him.  (<u>Id.</u> at 40:2-9.)  The bedroom door was shut to facilitate "a private conversation," but it was not locked.  (<u>Id.</u> at 26:5-8, 11-12.)  Neither agent wore their ballistic vest during the interview, but instead wore sweatshirts.  (<u>Id.</u> at 26:21-25.)  The Case Agent's firearm remained in its holster.  (<u>Id.</u> at 27:1-2.)

The interview began at 6:59 a.m.  (Interview Tr. at 2:1.)  The Case Agent informed Defendant that he was with the FBI, they had a search warrant, they would like to speak with him, and they would record the interview.  (<u>Id.</u> at 2:10-13; Doc. No. 92 at 27:4-19, 28:11-13.)  The agents did not inform him that they were investigating a child pornography crime.  (Doc. No. 92 at 28:5-7.)  They did not give him <u>Miranda</u> warnings.  (<u>Id.</u> at 28:14-15.)

The Case Agent provided Defendant with a copy of the search warrant, which Defendant reviewed.  (<u>Id.</u> at 28:7-10; Interview Tr. at 2:10-13.)  He also told Defendant that he was not under arrest, that they did not have an arrest warrant, and that he did not "have to talk to us, or anything like that." (Doc. No. 92 at 28:19-23; Interview Tr. at 2:13-14.)  Defendant was then asked whether he needed to leave for work or for any other obligation.  (Interview Tr. at 2:14-15, 46.)  When Defendant asked about the search warrant, the Case Agent explained its contents.  (<u>Id.</u> at 2:37, 39, 41, 43-45.)  Later in the interview, the Case Agent again discussed the search warrant with Defendant.  (<u>Id.</u> at 18:4, 6, 8, 10, 12, 14, 16, 18, 20, 22-24.)  Defendant was informed a second time that he was not under arrest, he did not have to speak with the Special Agents, and if he needed to leave for work or another reason, they could "figure that out."  (<u>Id.</u> at 3:1-2.)

D. Evidence Gathered by the Agents

The Special Agents' questioning evidenced their familiarity with the case and highlighted the amount of evidence collected during the investigation. The following is an exhaustive list of statements made by the agents during the interview:

(1) "So, what are you what are you doing online that you think might lead us here today?" (Id. at 4:5);

(2) "Hey, we're asking questions we already know the answers to, what's the name of the Twitter account?" (Id. at 4:8-9);

(3) "[W]e're obviously here for a reason. . . . We have a lot of questions that we already know the answers to." (Id. at 5:34-35, 39);

(4) "I know you have multiple Twitter accounts. They open up and shut down . . . ." (Id. at 6:11-12);

(5) "I know your criminal history. I know you've been through this before. I know you're scared. I know you don't want to go through it again, but unfortunately you went down that road again. And that's what brought us here today." (Id. at 6:19-22);

(6) "I know you use the name Jayden for emails . . . . I know you – you use Martez, right?" (Id. at 6:22-23);

(7) "Martez_xxx at yahoo.com is an email address that you have, right? And you use it for PayPal, right?" (Id. at 6:27-28);

(8) "How did you go back down the road? With child pornography again?" (Id. 6:34);

(9) "But you're right, you're going online, you are selling it." (Id. at 6:40);

(10)  "[W]e have the Twitter chats that you're having with people.  We've done search warrants. . . .  We have the Twitter DM's that you're having with other people."  (Id. at 7:30-31, 35);

(11)  "We found a guy that you sold to.  I know you use Kik."  (Id. at 7:39);

(12)  "All of the search warrants to Twitter that we did . . . the internet service here is Verizon and it's in your name, Anton Beasley. . . .  So listen also, all of that comes back to this address."  (Id. at 8:23-25; 9:1);

(13)  "The PayPal account that you have in Martez, again, is in your name, Beasley, and it has your old addresses . . . ."  (Id. at 9:5-6);

(14)  "I know you're scared. I know, listen, like I said, I know your criminal history.  I know you've been through this before, I know you don't want to go back to jail.  Nobody wants to go back to jail.  Unfortunately something happened that you went back down this road again . . . ."  (Id. at 9:27-30);

(15)  "I know you had to register for ten years [as a sex offender] . . . ."  (Id. at 9:32);

(16)  "[W]e have all this information, Anthony. . . .  We don't just bang on the door at 6:30 in the morning without a lot of information."  (Id. at 10:19-20, 22);

(17)  "I do know that you're collecting these links and collecting these files and you're selling them . . . ."  (Id. at 13:16-17);

(18)  "[S]o what we have now is all your accounts on Twitter the boyzcuties accounts on Twitter, the Tumblr accounts for boyzcuties."  (Id. at 14:21-23);

(19)  "And you're posting and you're making these videos available."  (Id. at 14:27);

(20)  "Just be honest.  We know you did [created the boyzcuties accounts]."  (Id. at 20:35);

11

(21) "The evidence is everything that we have in the case. This is . . . my file is much bigger than this." (Id. at 21:45-46);

(22) "[E]verything in the investigation comes back to you." (Id. at 22:9-10);

(23) "Listen, if if we found stuff on there today or not doesn't matter. . . . It doesn't matter because we already have a ton of evidence already from Twitter, all those Twitter accounts. You have like seven or eight Twitter accounts, and they – with the – with the search warrants and everything, they provide all of the videos that you already posted on there, we have all that already. We have everything tying it back to you." (Id. at 23:22, 26-30);

(24) "I mean, listen, we all know that's a lie so I wouldn't even say that that's not your computer. That's the last thing you want to do." (Id. at 27:19-20);

(25) "All the three of us here know, hah, me you, and Brian, all know that these are your accounts." (Id. at 29:33-34);

(26) "[W]e know that that's not the truth [in response to Defendant stating he did not engage in these crimes]. We know that the boyzcuties accounts are your accounts." (Id. at 32:21, 31-32);

(27) "[E]verything comes back to you. Everything comes back to your IP address. . . ." (Id. at 32:36-37);

(28) "We don't have to sit here and talk to you. We have everything that we need. But, I just want to give you the opportunity to tell the truth, accept responsibility, and then we can go from there." (Id. at 33:35-38);

(29) "We're not gonna believe you. Just don't even say it [in response to Defendant attempting to allege that someone else was responsible for the offenses]." (Id. at 34:37);

(30)  "Not possibly.  Let's stop using those words.  It's got . . . It has videos and stuff and pictures of child pornography on there.  It is what it is.  It's on there." (<u>Id.</u> at 36:34-35);

(31)  "We know it all Anthony.  We do our homework." (<u>Id.</u> at 37:27);

(32)  "I have, I have no issue proving that those are your accounts." (<u>Id.</u> at 39:21);

(33)  "How were they [the accounts] somebody else's?  Explain that to me.  Because that's not gonna make sense, cause it's a lie." (<u>Id.</u> at 40:6-7);

(34)  "We don't just knock on people's doors, seriously, this early in the morning if we don't have all of our, uh, evidence lined up." (<u>Id.</u> at 40:23-24);

(35)  "[W]e're taking everything.  We're gonna find, listen I'm going to make it ver-, very basic.  We're taking the computers, the phones.  We're gonna find child porn on em because you have it saved on there.  That's a guarantee.  I know you do.  We have, I think, seven or eight Twitter accounts and about eight or nine Tumblr accounts, all in boyzcuties.  All the IP addresses come back to the house here.  We have the Kik chat here that I showed you where you provide Martez triple x at yahoo for PayPal.  That person paid you five dollars.  You sent that Mega upload link to them, and we saw what it was, and it was child pornography.  The PayPal records are all coming back to your name.  All. . . ." (<u>Id.</u> at 42:10-19);

(36)  "I don't care if that computer was here.  It doesn't matter because we have all the online accounts." (<u>Id.</u> at 42:32-35);

(37)  "In every case, we pretty much have enough evidence to go in and just take everything.  We don't need to talk to people.  You know what I mean?  Like, I don't need to sit here for the past hour talking to you.  You know what I mean?" (<u>Id.</u> at 43:5-8);

(38)  "Your name.  Your IP address.  You name it.  Everything comes back to you."  (Id. at 43:27);

(39)  "Everything else is stacked against you right now.  The only thing that's gonna help you is to be honest and accept responsibility."  (Id. at 44:31-32);

(40)   "I got no problem saying that those are your accounts cause I know they're your accounts."  (Id. at 45:40-42);

(41)  "We have all the evidence to show that they're your accounts."  (Id. at 45:46);

(42)  "I think you need to, to, to realize what's going on like.  All these, everything's yours.  These accounts are yours.  The computers are yours.  Everything's yours."  (Id. at 50:43-45);

(43)   "You have hesitation like that because they're your accounts.  If they weren't your accounts, if we ask somebody else on the street are these your accounts, they'd be like no, what are you talking about.  Those aren't my accounts.  You sitting here going over and over. . . ."  (Id. at 54:1-4);

(44)  "I didn't have to sit here for an hour and a half and, and talk to you.  You know.  We have all the evidence already."  (Id. at 55:5-6.);

(45)  "It's a given that you did this.  It's what are you gonna do now about it and, are you gonna tell the truth and accept responsibility or not.  That's, that's the basic question."  (Id. at 57:38-40.)

During  the  interview,  the  Case  Agent  also  presented  Defendant  with  documentary evidence, including copies of:  (1) an online conversation on KIK between Defendant and a person looking to purchase videos depicting child pornography; (2) the payment receipt through PayPal; (3) Defendant sending a link of the purchased video; (4) a Twitter post, containing a clip of a child

pornography video, from one of the boyzcuties accounts; (5) the advertised Twitter video; (6) PayPal records containing Defendant's email address, phone numbers, residential addresses, and credit card number; and (7) a direct message on Twitter in which Defendant discussed his sale of video links and the possibility of trading links.  (Interview Tr. at 9:15-23; 14:41-42, 44; 15:4-6, 12-13, 23, 27-29, 38-40; 32:38-39, 41, 43, 45; 33:1-2, 18; 42:15-18; 50:1-3.)

The agents also repeatedly encouraged Defendant to be honest and cooperative and expressed the consequences of being dishonest, including the fact that "[l]ying to an FBI agent . . . [is] punishable by up to five years in prison."  (Id. at 6:15-19, 28-30; 7:41; 8:6; 10:7, 34-35; 11:10-13; 13:1-2; 14:30; 15:25; 16:24-25, 30, 34-36, 38-41; 20:35-36, 40-41; 21:11-16, 25-26; 22:18-19, 43-44, 46; 24:8-11, 37-45; 25:4, 6, 8-16; 26:5-6, 10, 14; 28:3-4; 29:27-29, 35-37; 31:35-38, 40; 34:20, 26-27; 39:17, 21-24, 28, 38; 41:19-20; 42:21-23; 44:27, 40-41; 52: 3-4, 6, 8, 10, 12-13, 15, 17-18; 53:1-2; 10-13; 55:4; 57:32-34; 58:7-8.)

Additionally, the agents stated that they were going to take Defendant's electronic devices, "something's gonna happen here," "this isn't going to go away," "it doesn't just go away," "probation [was] not an option," "[y]ou're right. It's impossible [to not get jail time], and that "[i]f convicted, there's no way you're avoiding jail time."  (Id. at 8:12-13; 10:7-8, 10, 12; 12:31, 33-34, 38-40, 42-43, 45; 16:20-22; 19:22, 24, 26; 21:6; 23:3-4, 6; 28:10-11, 19, 21, 23-24; 29:4, 8, 12, 16, 20-23; 31:29-31, 33; 42:8, 10-12; 45:16-18, 19, 21, 23; 46:28; 50:11, 13, 15; 51:1-2, 4, 8, 29, 32, 34; 60:2-3.)

Defendant did not ask to leave the interview, nor did he attempt to do so.  (Doc. No. 92 at 38:24-25; 39:1-3.)  The agents did not yell at him, stand in front of the door, hit him, threaten him, or brandish their weapons.  (Id. at 39:25; 41:1, 12-24.)  No other agents were present during the interview.  (Id. at 40:25; 41:1-5.)  Defendant did not eat anything during the interview, and he did

not use the restroom.  (Id. at 64:8-14.)  He did not request food nor a break to use the restroom. He twice stated that he was tired.  (Interview Tr. at 32:41; 48:27.)

    E.  Defendant's Emotions During the Interrogation

Defendant cried during the interview.  (Id. at 13:8, 12, 22, 26, 32; 15:2; 21:9; 26:8, 12, 16, 26; 27:9; 28:1.)  He also expressed emotional distress by stating:

(1)  "I mean, I'm, first of all, I'm scared to death here, I don't know what's going on.  So, I mean, like . . .  I'm really really scared to death here."  (Id. at 6:2-3, 7);

(2)  "[T]his is crazy, there's no . . . my life is over. . . .  It is too over."  (Id. at 12:15-16, 20; 13:36; 26:16, 20; 29:25; 31:24; 46:35, 41);

(3)  "[T]his is messed up . . . ."  (Id. at 12:20; 38:31);

(4)  "There's no way I can get outta this."  (Id. at 13:22; 15:21; 20:16, 20-21, 45-46; 27:10);

(5)  "So there's just no way out of this, is it? . . .  This is this is jail time."  (Id. at 16:10, 14, 18; 21:4; 46:26);

(6)  "Nah, I'm sorry.  I'm just shaken."  (Id. at 20:8);

(7)  "I mean, I'm just screwed . . . ."  (Id. at 24:1);

(8)  "I might, I might, I might as well like, just give me suicide or something . . . ."  (Id. at 24:28-29; 48:15-16); and

(9)  "[I]t's almost impossible, to, oh my god, I don't know how I'm going to avoid jail time."  (Id. at 27:37-38.)

He did laugh at times during the interview.  (Id. at 4:44, 46; 17:17, 19; 20:4; 32:21; 35:26; 48:13.)

Defendant perceived the questioning as an attempt to secure a confession, as evidenced by the following: (1) "[y]'all basically here to get, get a confession from me. That's basically what

16

this is" (Id. at 42:40-41); (2) "[s]o basically, so basically you all just hearing me, y'all just want me, y'all need a confession on tape" (Id. at 44:7-8); (3) "[s]o, that's the only, that's actually what y'all waiting for, for me to confess" (Id. at 44:43); and (4) "[s]o, that's what you waiting, y'all just waiting, y'all just want me to confess that all the accounts are mine."  (Id. at 58:26-27.)

    F.   <u>Defendant's Invocation of his Right to Counsel</u>

    Most importantly, Defendant mentioned his need to speak with an attorney seven times. These statements are as follows:

1. "I need a lawyer or something because this is, this is crazy."  (Id. at 8:15-16)

2. "I gotta see somebody before I answer any questions."  (Id. at 20:4)[6]

3. "I, gotta, I gotta, I gotta talk to somebody."  (Id. at 27:15-16)

4. "I have, I have to, I have to talk to a lawyer."  (Id. at 55:22)

5. "I have to talk to somebody."  (Id. at 56:8-9)

6. "I gotta talk to somebody, I gotta, I wanna take the fifth.  I gotta talk to a lawyer. . . .  I gotta talk to the federal, some kind of lawyer or something."  (Id. at 59:24-25, 29)

7. "I have to talk to a lawyer."  (Id. at 61:2)[7]

---

[6]    Neither party addressed this particular statement or the use of the word "somebody," but, putting it in context, the Court construes it as an invocation by Defendant of his right to counsel and will treat it as such.

[7]    The Case Agent acknowledged these requests during the Motion to Suppress Hearing:

    Government Counsel: Now, prior to that [Defendant's final invocation], did the Defendant reference an attorney at all?

    The Case Agent: He did reference an attorney throughout the interview.

    Government Counsel: Okay. At various points?

    The Case Agent: Yes.

The interview concluded with this final assertion and ended at 8:38 a.m.  (Doc. No. 92 at 33:7-12.)

### 1.   First Invocation Regarding Counsel

After Defendant's first invocation, the Case Agent said: "This is crazy?"  (Interview Tr. at 8:18.)  Defendant then asked the Special Agents "[h]ow y'all link?  All this.  I don't understand how you link that to here."  (Doc. No. 92 at 35:2-9; Interview Tr. at 8:20-21.)

### 2.   Second Invocation Regarding Counsel

Defendant next stated: "I gotta see somebody before I answer any questions."  (Interview Tr. at 20:4.)  The Second Agent then asked: "[w]hat's that? I can't hear you."  (Id. at 20:6.) Defendant replied: "[n]ah I'm sorry. I'm just shaken."  (Id. at 20:8.)

### 3.   Third Invocation Regarding Counsel

After his third statement, Defendant continued to engage with the agents.  (Doc. No. 92 at 35:23-25.)  He discussed the contents of his computer and his fear of going to jail, and then asked, about a minute later, "[o]kay, let's say, okay, you take the stuff, you find the forensics, you find stuff on there, then what?"  (Interview Tr. at 28:16-17.)  He further questioned the agents about how long it would take for the prosecutor to make a decision and how many years he would be imprisoned for if convicted.  (Id. at 28:21; 29:14, 16, 18.)

---

Government Counsel: Prior to the one that ended it?

The Case Agent: Yes.

(Doc. No. 92 at 33:13-20.)

### 4.   Fourth Invocation Regarding Counsel

Prior to Defendant's fourth request for counsel, at about one hour and eighteen (18) minutes into the questioning, the Case Agent began to pack up his materials.  (Id. at 50:8.)  About ten minutes later, after further conversation, the Case Agent stated, "[a]lright, well I'm done."  (Id. at 55:18.)  Defendant then made his fourth invocation, upon which the Second Agent said "[o]kay. That's fine."  (Id. at 55:24.)  Defendant followed this statement with "I mean, I don't have the money for a lawyer."  (Id. at 55:28.)  The Case Agent did not tell Defendant that he could obtain legal counsel regardless of his financial status, but instead said "[t]hat's fine."[8]  (Id. at 55:30; Doc. No. 92 at 60:20-23.)

### 5.   Fifth, Sixth, and Seventh Invocations Regarding Counsel

Defendant then stated: "I have to talk to somebody."  (Interview Tr. at 56:8-9.)  The Case Agent responded: "[t]hat's fine. That's fine. So, okay. So, we're done."  (Id. at 56:11.)  The Case Agent noted the conclusion of the interview and the time.  (Id.)  Immediately after, Defendant said "I mean, I'm not saying they were mine. I'm not saying they not mine. I mean . . . ."  (Id. at 56:13.)

---

[8]   The Case Agent confirmed that he did not alert Defendant to his right to have counsel appointed regardless of his financial status.  The following colloquy occurred at the Motion to Suppress Hearing:

> Defense Counsel: Now, at one point – maybe we can do this without playing it if you recall this – you remember at one point, Mr. Beasley said, I need to talk to a lawyer.  I don't have money for a lawyer.  I don't have money for a lawyer.  You remember that?

> The Case Agent: Yes.

> Defense Counsel: Did you at that point, say, if you want an attorney, one can be provided for you free of charge? Did you tell him that?

> The Case Agent: No.

(Doc. No. 92 at 60: 15-23.)

19

The Case Agent explained that he had not yet turned the recording off and gave Defendant an additional opportunity to speak.  (Id. at 56:15-16.)  The following conversation ensued:

> The Case Agent: Do you want to talk to an attorney like you said or do you want to talk about it?  Because you say that and then you keep talking.
>
> . . .
>
> Defendant: Y'all just waiting, y'all just want me to confess . . .
>
> . . .
>
> The Case Agent: Cause I can't stand here any longer.
>
> . . .
>
> Defendant: Um, I'm going to, I'm going to say that, I'm gonna say the account, I'm, I'm, I'm, I think I'm, I think I'm not gonna say anything.
>
> . . .
>
> Defendant: Um. I think I'm gonna just um.  I wanna, I wanna, I'm gonna, I'm not, I'm, I'm just gonna just, I gotta talk to somebody, I gotta, I wanna take the fifth.  I gotta talk to a lawyer.
>
> The Case Agent: Okay.
>
> Defendant: I gotta talk to the federal, some kind of lawyer or something.
>
> The Case Agent: Okay.
>
> Defendant: I, I can't. . .
>
> The Case Agent: Now, this is like the second or third time you said that, and then I say okay and then you keep talking.  So, are we, are we, are we done because? . . . From the very beginning, I told you you didn't have to talk to us so.  What do you wanna do?
>
> . . .
>
> Defendant: I, I, I mean, is it the option to call like, to, to tell you, confess like later on and that's not. . .
>
> The Case Agent: Yeah.  Yeah.  Do whatever you want.

Defendant: Alright, well I have to…

The Case Agent: Might not be as easy because you know, it's easier, I'm right here. And you know the truth and you know what you wanna say. You just can't say it. You just can't get the words out. It's easier to just take care of it now.

Defendant: This stuff will lead to my doggone name.

The Case Agent: Yes. Everything is in your name. Everything is on your computer. So, that's it. So, again with the scenario laid out, I'm gonna ask you one more time and then that's it. That's it. I'm gonna shut it off and we're done. You created the boyzcuties accounts. You got the links from other people online that were free. You saw what the links were. You saw it was child pornography. You posted the preview videos and stuff on your Twitter. People would offer to either buy or trade, and you would sell them those videos over PayPal, Cash App, five dollars, ten dollars, whatever it cost. Is that what happened here?

Defendant: I have to talk to a lawyer.

The Case Agent: Okay. That's fine. Is, is, is that it then? Because you say that and then you keep talking.

Defendant: That's it.

The Case Agent: Ok. Then we're done. . . .

(Id. at 56:16-17; 58:26-27, 40; 59:8-9, 23-25, 27, 29, 31, 33, 35-36; 60:23-24, 26-27, 29, 31, 33-35, 37, 39-46; 61:2.)

The Case Agent testified that the final statement terminated the interview "[b]ecause he was clear at that point that he wanted a lawyer, he didn't want to talk to anyone." (Doc. No. 92 at 37:14-17.) By contrast, after every prior request to speak with someone, the Case Agent testified that Defendant "would ask us questions, again, like how we linked this to the house, or he would then just go into something else and keep talking." (Id. at 37:18-25.)

The interview lasted one hour, thirty-nine (39) minutes, and twelve (12) seconds, concluding at 8:38 a.m. (Id. at 38:1-2; Interview Tr. at 61:9.) After the interview and while at the

residence, the Case Agent reviewed the evidence collected by the search team,[9] spoke with the U.S. Attorney's Office, and arrested Defendant.  (Doc. No. 92 at 38:6-14.)

## III.    CONCLUSIONS OF LAW

A.  <u>Introduction</u>

Defendant asserts that "[t]here are three questions to be resolved in this matter to determine whether or not the Defendant's statement should be suppressed."  (Doc. No. 70 at 4.)  Those questions are:

> 1. Whether <u>Miranda</u> warnings were given to the Defendant?
> 2. Whether the Defendant requested counsel or waived his right to counsel?
> 3. Whether the overall questioning of the Defendant was coercive in nature?

<u>Id.</u> at 5.

The Court will address each question in turn.

1.  <u>Miranda Warnings</u>

Defendant first seeks suppression of his statement because despite being in custody, "there is no indication that the Defendant was advised of his full <u>Miranda</u> warnings, nor that the Defendant waived the same."  (Doc. No. 70 at 5.)  Accordingly, he argues that "his constitutional right to remain silent was violated as a matter of law . . . ."  (<u>Id.</u>)  In his Supplemental Memorandum, Defendant reasserts that he was in custody and was "deprived of his freedom of action" and therefore should have received <u>Miranda</u> warnings.  (Doc. No. 97 at 11.)

In support of this claim, Defendant references the following facts:  (1) ten law enforcement officers bearing arms and tactical gear entered his home before 7 o'clock in the morning; (2)

---

[9]    During the Motion to Suppress hearing, the Case Agent described the items to be seized as "computer equipment" and some "CDs or DVDs."  (Doc. No. 92 at 45:21-22; 70:8-13.)  During the interview, the Case Agent told Defendant that they were going to take his computer, phones, external hard drives, and thumb drives.  (Interview Tr. at 8:12-13; 42:10-12; 51:29-30.)

Defendant was "physically prohibited" from walking up the stairs; (3) Defendant was constantly monitored by officers and was kept in the living room with three agents surveilling him; (4) his interview by the Agents was conducted in a small bedroom with the door closed and with the agents "standing over him" while Defendant sat on a bed; (5) the agents had "submitted to the local magistrate a probable cause affidavit indicating that Anthony Beasley was the target of the investigation"; and (6) Defendant was arrested after the interview.  (Id. at 2-4, 6, 11.)  Defendant also argues that he was in custody and not free to leave the house because the agents informed him that "they already knew what he had done, and that they wanted to determine whether or not he would admit what he had done" and that such statements, based upon the Supreme Court's holding in Stansbury v. California, 511 U.S. 318, 325 (1994), "are relevant in determining whether or not the suspect subjectively felt that he was in custody, and not free to leave."  (Id. at 12.)

Lastly, Defendant notes that: (1) he was never told that he was free to leave; (2) his attempts to speak with an attorney were not heeded; (3) he was not informed that an attorney could be appointed; and (4) he did not waive his Miranda rights.  (Id. at 4-6, 12.)  In sum, Defendant argues that "[u]nder the totality of the circumstances of this case, the Agents were duty-bound to provide Mr. Beasley with his Miranda rights, and failing to do so enabled them to obtain an incriminating statement from Mr. Beasley in violation of his Constitutional rights."  (Id. at 12-13) (emphasis added).

The Government maintains that Defendant's constitutional rights were not violated because he was not in custody, and therefore Miranda warnings were not necessary.  (Doc. Nos. 80 at 10; 102 at 2.)  Specifically, it argues that "Miranda warnings are not required where a defendant is told he does not need to answer questions, he is not in custody and is free to leave, and the questioning

occurs in his own home with no showing of force made by law enforcement."[10]  (Doc. No. 80 at

8.)  The Government then states: "the location and brief duration of the interview, its conversational

tone, the lack of physical or verbal intimidation, and the fact that the interview concluded without

incident, all point to the conclusion that under such circumstances, 'a reasonable person' would

have felt that he was 'at liberty to terminate the interrogation.'"  (Id. at 9) (citations omitted).  In

its Response to the Supplemental Memorandum, the Government focuses on the following facts

to support its argument that Defendant was not in custody: (1) Defendant was given a copy of the

search warrant; (2) Defendant was informed that he was not under arrest and that he was not

obligated to speak with the agents; (3) he was "not restrained in any way"; (4) the agents "did not

raise their voices, show their weapons, or in any other way display a show of force"; (5) the

interview occurred in an unlocked bedroom in the Defendant's home; (6) the interview was under

two hours; and (7) Defendant "voluntarily submitted to the questioning and never attempted to

leave." (Doc. No. 102 at 3.)  Consequently, the Government argues that Defendant's statements

should not be suppressed.  (Id.)

Taking all relevant facts into consideration, the Court concludes contrary to the

Government's position that Defendant was subjected to a custodial interrogation that necessitated

---

[10]   However, as noted supra during the Motions hearing, the following colloquy occurred:

> The Court: Just one or two questions.  Did you advise at any time Mr. Beasley,
> [that] he was free to leave the house?

> The Case Agent: No.  At the very beginning, we talked about his employment and
> if he had to go anywhere for work, but I never said like you're free to leave, just
> that he did not have [to] speak with us, and that he's not under arrest.

(Doc. No. 92 at 70:15-21.)

Miranda warnings be given to him before the interrogation began.  The agents did not provide the required warnings.  Accordingly, Defendant's Motion to Suppress [His] Statement will be granted.

2.   Miranda Warnings and the Custodial Interrogation Requirement

One of the preeminent legal protections afforded to criminal defendants is the right to be free from self-incrimination under the Fifth Amendment to the United States Constitution.[11]  The Fifth Amendment provides: "[n]o person shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend V.  To advance this legal protection, the Supreme Court established Miranda warnings, which require that one subject to custodial interrogation be informed, "prior to any questioning . . . that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Miranda v. Arizona, 384 U.S. 436, 444, 467-68 (1966).[12] These warnings are characterized as "an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere."  Id. at 467, 471.  The rights contained within Miranda warnings are strictly upheld, and if one "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning."  Id. at 444-45, 474 (emphasis added).  Then "[a]t that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning."  Id. at 474.

---

[11]   See Miranda v. Arizona, 384 U.S. 436, 468 (1966) ("The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege is so simple . . . .").

[12]   The importance of these rights is recognized by the Federal Bureau of Investigation.  See id. at 484 ("The standard warning long given by Special Agents of the FBI to both suspects and persons under arrest is that the person has a right to say nothing and a right to counsel, and that any statement he does make may be used against him in court.")

Under <u>Miranda</u>, the warning of one's right to legal counsel is "indispensable to the protection of the Fifth Amendment privilege" and it is further necessary, "[i]n order to fully apprise a person interrogated of the extent of his rights under this system . . . to warn him . . . that if he is indigent a lawyer will be appointed to represent him." <u>Id.</u> at 469, 473.[13]  Accordingly, if an interrogation proceeds without an attorney and a suspect makes a statement, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." <u>Id.</u> at 475 (citing <u>Escobedo v. State of Illinois</u>, 378 U.S. 478, 490 n.14 (1964)); <u>see also</u> <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979) ("The courts presume that a defendant did not waive his rights; the prosecution's burden is great . . . .")  Further, the Supreme Court has stated that it "will not presume that a defendant has been effectively apprised of his rights and that his privilege against self-incrimination has been adequately safeguarded on a record that does not show that any warnings have been given or that any effective alternative has been employed." <u>Id.</u> at 498.

<u>Miranda</u> warnings are only required when a suspect is subject to custodial interrogation. <u>See</u> <u>generally</u> <u>United States v. Fratus</u>, No. 20-00270, 2021 WL 51458, at *1, *4 (E.D. Pa. Jan. 6, 2021); <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977); <u>Edwards v. Arizona</u>, 451 U.S. 477, 485-86 (1981); <u>United States v. Willaman</u>, 437 F.3d 354, 359 (3d Cir. 2006) (citing <u>Miranda</u>, 384 U.S.

---

[13]   Again, the Federal Bureau of Investigation's policy recognizes this right.  <u>See</u> <u>id.</u> at 484-86:

> After passage of the Criminal Justice Act of 1964, which provides free counsel for Federal defendants unable to pay, we added to our instructions to Special Agents the requirement that any person who is under arrest for an offense under FBI jurisdiction, or whose arrest is contemplated following the interview, must also be advised of his right to free counsel if he is unable to pay, and the fact that such counsel will be assigned by the Judge.

at 468).   Accordingly, to properly analyze Defendant's Motion to Suppress, a discussion of custodial interrogation is warranted.

Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.  The term "custody" has been described as a set of "circumstances that are thought generally to present a serious danger of coercion."[14] United States v. Ludwikowski, 944 F.3d 123, 131 (3d Cir. 2019) (citing Howes v. Fields, 565 U.S. 499, 508-09 (2012)).  In determining whether a defendant was in custody, the court is to focus on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323.  However,

> an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave."

Id. at 325.

Interrogation is defined as "not only [] express questioning, but also [] any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  "For a person to be in custody when he has not been arrested, 'something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which

---

[14]  See also Miranda v. Arizona, 384 U.S. 436, 467 (1966) (defining in-custody interrogation as "contain[ing] inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely").

indicates that they would not have heeded a request to depart or to allow the suspect to do so.'"

Willaman, 437 F.3d at 359 (citing Steigler, 496 F.2d at 799).

The Supreme Court has provided further guidance on the custody analysis. In J.D.B. v.

North Carolina, it explained:

> 'Two discrete inquiries are essential to the determination: first, what were the
> circumstances surrounding the interrogation; and second, given those
> circumstances, would a reasonable person have felt he or she was at liberty to
> terminate the interrogation and leave.  Once the scene is set and the players' lines
> and actions are reconstructed, the court must apply an objective test to resolve the
> ultimate inquiry: was there a formal arrest or restraint on freedom of movement of
> the degree associated with formal arrest.' Thompson v. Keohane, 516 U.S. 99, 112,
> (1995).

564 U.S. 261, 270 (2011) (internal quotation marks, alteration, and footnote omitted). One year

later, the Supreme Court listed the following factors as part of a custody determination: (1)

"location of the questioning"; (2) "its duration"; (3) "statements made during the interview"; (4)

"the presence or absence of physical restraints during the questioning"; and (5) "the release of the

interviewee at the end of the questioning."  Howes, 565 U.S. 499, 509 (2012) (internal citations

omitted).

The Third Circuit Court of Appeals has noted that "the term 'custodial interrogation' defies

easy definition . . . [and] that such a determination requires individualized analysis on a case-by-

case basis." Alston v. Redman, 34 F.3d 1237, 1245 (3d Cir. 1994) (citing United States v. Mesa,

538 F.2d 582, 584 (3d Cir. 1980)); see United States v. Vidal, 85 F. App'x 858, 861 (citations

omitted).  To aid in this analysis, however, it has outlined factors to consider, many of which mirror

those proffered in Howes.  Those are:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the
> location or physical surroundings of the interrogation; (3) the length of the
> interrogation; (4) whether the officers used coercive tactics such as hostile tones of
> voice, the display of weapons, or physical restraint of the suspect's movement; and
> (5) whether the suspect voluntarily submitted to questioning.

Willaman, 437 F.3d at 359-60 (citations omitted); United States v. King, 604 F.3d 125, 138 (3d Cir. 2010); Ludwikowski, 944 F.3d at 132.  Also, "[a]dditional factors deemed important by the Third Circuit include what information was known by the officer concerning the suspect's culpability and whether the officer revealed his belief that the suspect was guilty."  United States v. Jones, No. 11-261, 2011 WL 4011406, at *3 (E.D. Pa. Sep. 8, 2011) (internal quotations omitted) (quoting United States v. Rodriguez, No. 09-219, 2010 WL 1485704, at *6 (M.D. Pa. Apr. 12, 2010)).  Furthermore, the Third Circuit has stated that a court should also consider "whether he [the defendant] agreed to meet knowing that he would be questioned about a criminal offense." Ludwikowski, 944 F.3d at 132 (citing United States v. Jacobs, 431 F.3d 99, 105-06 (3d Cir. 2005)).

Importantly, the above-stated factors must be reviewed in conjunction with "'the additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda.'"  Id. (citations omitted).

Given the above legal precepts, the Court will first discuss the two-part guidance given by the United States Supreme Court in J.D.B.

In J.D.B., the Supreme Court emphasized the importance of conducting the custody analysis "[o]nce the scene is set and the players' lines and actions are reconstructed . . . ."  564 U.S. 261 at 270 (citing Keohane, 516 U.S. at 112).  To do so, the Court must review "the circumstances surrounding the interrogation."  Id.  Then the Court is tasked with answering the following question: "given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave."  Id.

Accordingly, the Court will first set the scene, drawing particular attention to the salient facts most relevant for the disposition of the present Motion.

B.  Circumstances Surrounding the Investigation

    1.  Pre-Interview

First, the Court will describe what occurred before the interview began.  On January 30, 2020, the search warrant was executed at Defendant's residence.  (Doc. No. 92 at 18:23-25.)  The search began at 6:45 a.m. with ten law enforcement agents entering the premises with their guns drawn.  (Id. at 46:19-25; 47:1-4; 48:2-10.)  Upon entering the home, the Case Agent "grabbed" Defendant's arm on the steps and led him to the living room, where Defendant was monitored by several agents.  (Id. at 21:2-12, 23-25; 22:1-9.)  The Case Agent testified that Defendant was not free to leave, nor was he able to move freely about the home while the other agents conducted a protective sweep.  (Id. at 51:1-3, 6-9.)  While the Case Agent stated that "if he [Defendant] indicate[d] that he want[ed] to leave [after the completion of the protective sweep], he would have left," (Id. at 51:1-3, 6-9; 53:4-8), he also informed the Court that he never told Defendant that he was free to leave.  (Id. at 70:15-21.)

    2.  Interrogation

Second, the Court will recount the environment in which the interrogation occurred.  The agents conducted Defendant's questioning in a second-floor bedroom.  (Id. at 25:13-18.)  The Case Agent described the bedroom as "small" and with a "bigger bed," and that the only other furniture in the room was a few dressers.  (Id.; id. at 40:6-7.)  The bedroom did not have chairs, so the agents stood "within a few feet" of Defendant, who sat on the bed.  (Id. at 25:19-25; 40:2-9.)  The bedroom door was shut.  (Id. at 26:5-8.)  The Case Agent's firearm remained holstered, but visible.  (Id. at 27:1-2.)

The agents peppered Defendant with questions.  And while questioning Defendant, the agents continually emphasized the importance of his honesty and cooperation, and the Second

Agent told Defendant that if he lied to them, he could be subject to five years in prison. (Id. at 6:15-19, 28-30; 7:41; 8:6; 10:7, 34-35; 11:10-13; 13:1-2; 14:30; 15:25; 16:24-25, 30, 34-36, 38-41; 20:35-36, 40-41; 21:11-16, 25-26; 22:18-19, 43-44, 46; 24:8-11, 37-45; 25:4, 6, 8-16; 26:5-6, 10, 14; 28:3-4; 29:27-29, 35-37; 31:35-38, 40; 34:20, 26-27; 39:17, 21-24, 28, 38; 41:19-20; 42:21-23; 44:27, 40-41; 52: 3-4, 6, 8, 10, 12-13, 15, 17-18; 53:1-2; 10-13; 55:4; 57:32-34; 58:7-8.) The agents also repeatedly told Defendant that his truthfulness and assistance would be conveyed to the prosecutor and the judge, and that such truthfulness was looked upon favorably. (Interview Tr. at 16:34-26; 24:3-6, 32-35, 42-43, 45; 29:22-23; 31:30-33; 51:12-13, 17-18; 56:32-34.)

It is also important for the Court to analyze Defendant's demeanor and statements during the interview. First, Defendant twice referenced that he was tired. (Interview Tr. at 32:41; 48:27.) Second, Defendant cried several times. (Id. at 13:8, 12, 22, 26, 32; 15:2; 21:9; 26:8, 12, 16, 26; 27:9; 28:1.) Third, Defendant expressed his fear by stating the following:

(1) I mean, I'm, first of all, I'm scared to death here, I don't know what's going on. So, I mean, like . . . I'm really really scared to death here." (Id. at 6:2-3, 7);

(2) "[T]his is crazy, there's no . . . my life is over. . . . It is too over." (Id. at 12:15-16, 20; 13:36; 26:16, 20; 29:25; 31:24; 46:35, 41);

(3) "There's no way I can get outta this." (Id. at 13:22; 15:21; 20:16, 20-21, 45-46; 27:10);

(4) "So there's just no way out of this, is it? . . . This is this is jail time." (Id. at 16:10, 14, 18; 21:4; 46:26);

(5) "Nah, I'm sorry. I'm just shaken." (Id. at 20:8);

(6) "I mean, I'm just screwed . . . ." (Id. at 24:1);

(7) "I might, I might, I might as well like, just give me suicide or something . . . ." (Id. at 24:28-29; 48:15-16).

Fourth, Defendant also vocalized his belief that the interview's sole purpose was to secure a confession.  (Id. at 42:40-41; 44:7-8; 44:43; 58:26-27.)

Fifth, Defendant requested legal counsel seven times during the course of the interview. The Case Agent acknowledged these requests during the Motion to Suppress Hearing:

> Government Counsel: Now, prior to that [Defendant's final invocation], did the Defendant reference an attorney at all?
>
> The Case Agent: He did reference an attorney throughout the interview.
>
> Government Counsel: Okay.  At various points?
>
> The Case Agent: Yes.
>
> Government Counsel: Prior to the one that ended it?
>
> The Case Agent: Yes.

(Doc. No. 92 at 33:13-20.)  Furthermore, in requesting an attorney, Defendant told the agents that he did not have the means to pay for legal representation.  (Interview Tr. at 55:28.)  He was never informed that he still had a right to an attorney and that one would be appointed regardless of his financial status.  (Doc. No. 92 at 60:15-23.)

### 3. Post-Interview

After the interview, the Case Agent reviewed the evidence found by the search team,[15] consulted with the U.S. Attorney's Office, and arrested Defendant soon after.  (Doc. No. 92 at 38:6-14.)  There is no indication that Defendant was given his Miranda warnings after the arrest.

Now that the scene has been set, the Court must turn its attention to the second inquiry set forth in J.D.B.: "given those circumstances, would a reasonable person have felt he or she was at

---

[15]  As noted earlier, the Case Agent described the items to be seized as "computer equipment" and some "CDs or DVDs."  (Doc. No. 92 at 45:21-22; 70:8-13.)  In addition, during the interview, he told Defendant that they were going to take his computer, phones, external hard drives, and thumb drives.  (Interview Tr. at 8:12-13; 42:10-12; 51:29-30.)

liberty to terminate the interrogation and leave." J.D.B., 564 at 270.  In Ludwikowski, the court explained that:

> Numerous factors help answer this question [whether a reasonable person would have felt that he or she was at liberty to terminate the interrogation and leave]: the interview's location, physical surroundings, and duration; whether he voluntarily participated; whether he was physically restrained; whether other coercive tactics were used, such as hostile tones of voice or the display of weapons; and whether the interviewee was released when the questioning was over.

944 F.3d at 132 (citing Jacobs, 431 F.3d at 105, and Willaman, 437 F.3d at 359-60)).  The court also enumerated additional factors as noted earlier: "[1] whether the questioner believed the interviewee was guilty; [2] whether the interviewee was specifically told he was not under arrest; and [3] whether he agreed to meet knowing that he would be questioned about a criminal offense." Id. (citing Jacobs, 431 F.3d at 105-06.)

Therefore, to properly analyze the second prong set forth in J.D.B., whether a reasonable person would have felt free to leave given the circumstances, each of the factors noted above needs to be addressed.

### C. Whether a Reasonable Person Would Have Felt at Liberty to Terminate the Interrogation and Leave

#### 1. The Interview's Location, Physical Surroundings, and Duration

##### i. Location and Physical Surroundings

First, the location and physical surroundings of the contested interrogation will be analyzed.  While the traditional view of a custodial interrogation conjures an image of a suspect being questioned at a police station, "the Supreme Court, in Orozco v. Texas . . . erased any doubt that custodial interrogation may occur outside the police station." Steigler v. Anderson, 496 F.2d 793, 798-99 (3d Cir. 1974) (citing Orozco, 394 U.S. at 324 (1969)).  Specifically, the Supreme Court wrote:

The State has argued here that since petitioner was interrogated on his own bed, in familiar surroundings, our Miranda holding should not apply. It is true that the Court did say in Miranda that "compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." 384 U.S., at 461, 86 S.Ct., at 1621. But the opinion iterated and reiterated the absolute necessity for officers interrogating people 'in custody' to give the described warnings. See Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

Orozco, 394 U.S. at 326-27.

In Orozco, the defendant resided in a boardinghouse. Id. at 325. After suspecting that the defendant committed murder, four police officers traveled to the boardinghouse, entered his room at 4 a.m., and questioned him. Id. One of the officers testified that the defendant, "from the moment he gave his name . . . was not free to go where he pleased but was 'under arrest.'" Id.

The Court's analysis proceeded as follows:

The trial testimony clearly shows that the officers questioned petitioner about incriminating facts without first informing him of his right to remain silent, his right to have the advice of a lawyer before making any statement, and his right to have a lawyer appointed to assist him if he could not afford to hire one. . . . We . . . hold that the use of these admissions obtained in the absence of the required warnings was a flat violation of the Self-Incrimination Clause of the Fifth Amendment as construed in Miranda.

Id. at 326.[16]

The Court then wrote:

According to the officer's testimony, petitioner was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning. The Miranda opinion declared that the warnings were required when the person being interrogated was 'in custody at the station or otherwise deprived of his freedom of action in any significant way.' 384 U.S., at 477, 86 S.Ct., at 1629. (Emphasis supplied.)

---

[16] See also Steigler v. Anderson, 360 F. Supp. 1286, 1290 (D. Del. 1973) (synthesizing Orozco as a "defendant [who] was questioned in his bedroom at 4:00 A.M. by four policemen under circumstances demonstrating a clear deprivation of freedom and with prior direct evidence linking him to the crime").

Id. at 327.

Here, even though Defendant was never formally told he was "under arrest" until the interrogation apparently concluded, the other facts are comparable to those in Orozco. Defendant was interviewed in the early hours of the morning in a small bedroom on the second floor of his home. (Doc. No. 92 at 25:11-15; Interview Tr. at 2:1.) The bedroom door was closed, and the two agents stood "within a few feet of Defendant," who sat on the bed. (Interview Tr. at 25:19-25; 26:5-8, 11-12; 40:2-9.) Finally, the Case Agent never told Defendant that he was free to leave. (Doc. No. 92 at 70:15-20.)

Further, in Miranda, the Supreme Court described the disputed investigations as follows: "[i]n each [case], the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world. In none of these cases was the defendant given a full and effective warning of his rights at the outset of their interrogation process." Miranda, 384 U.S. at 445.

Here, too, the objective circumstances of Defendant's interrogation were as follows: (1) he was questioned by federal agents; (2) "in a room in which he was cut off from the outside world"; and (3) was deprived of "a full and effective warning of his rights at the outset of [the] interrogation process." While the defendants in Miranda were subject to a police house interrogation and Defendant was subject to an interrogation in his home, the underlying cases "share salient features – incommunicado interrogation of individuals in a police-dominated atmosphere, resulting in self-incriminating statements without full warnings of constitutional rights." Id.

The Government's argument here mirrors that made by the State in Orozco. Specifically, it argues that "[t]he fact that an interrogation took place in the defendant's home, as here, undermines a claim that he is in custody." (Doc. No. 80 at 9.) It is true that typically, "the surroundings [of

an at-home interrogation] are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation."  Willaman, 437 F.3d at 360 (citing United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004)); see also United States v. Ramos-Colon, No. 19-186, 2021 WL 2255899, at *6 (E.D. Pa. June 3, 2021) (interview conducted in kitchen at 6:00 a.m.); United States v. McKinney, 695 F. Supp. 2d 182, 190 (E.D. Pa. 2010) (citing United States v. Kofsky, 2007 WL 2480971 (E.D. Pa. Aug. 28, 2007) (interview conducted in office space that doubled as living quarters at 9:00 p.m.); Killingsworth, 118 F. App'x at 651 ("We agree that 'an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody.'") (citing Czichray, 378 F.3d at 826).

However, the facts in this case are sufficiently distinct from the facts in cases where the court concluded that a defendant was not subject to a custodial interrogation.  For example, in Ramos-Colon, the interview was conducted in a kitchen by one officer and the officer "repeatedly told [defendant] that she was free to leave."  Ramos-Colon, 2021 WL 2255899, at *1-2, *6.  And in McKinney, (1) the interview took place in the defendant's living quarters, which also functioned as an office; (2) the interview was conducted by one DEA Diversion Investigator; and (3) the defendant "was not isolated to any particular area of his office."  McKinney, 695 F. Supp. 2d at 186.

Here, by contrast, Defendant was isolated in a small, closed-door bedroom, which is starkly different from a kitchen.  Further, Defendant sat in the presence of two agents, who physically stood above him and within a few feet of him, and whose weapons, although not drawn, were visible.  While the Case Agent testified that he did not stand over Defendant and that there was space between him and Defendant, the objective circumstances of the interrogation compel the

conclusion that a reasonable person in Defendant's circumstances would not have felt that he was free to leave.

ii. <u>Duration</u>

The length of the interrogation is another factor to be considered.  It is undisputed that in this jurisdiction, "courts have found interrogations lasting between one and one half hours and seven hours to be non-custodial."  <u>Jones</u>, 2011 WL 4011406, at *3 (citing <u>McKinney</u>, 695 F. Supp. 2d at 191); <u>Killingsworth</u>, 118 F. App'x at 651-52.

In this case, the agents interviewed Defendant for one hour and thirty-nine minutes.  (Doc. No. 92 at 38:1-2.)  On initial review, then, this factor would appear to weigh against a finding that the disputed interview was a custodial interrogation.

However, courts have made it clear that duration is simply one consideration in the custodial interrogation analysis.  <u>See</u>, <u>e.g.</u>, <u>Killingsworth</u>, 118 F. App'x at 652.  In <u>Killingsworth</u>, the court held that a "reasonably objective person would [not have] believe[d] himself to be in custody" because the defendant's interaction with law enforcement was for less than ten minutes and there was no "use of physical force, an actual arrest or some other strong indication of restricted freedom."  <u>Killingsworth</u>, 118 F. App'x at 652.

Here, by contrast, the Case Agent applied physical force before the interview when he grabbed Defendant's arm and led him to the living room, and there was also a "strong indication of restricted freedom" because Defendant was unable to leave or move freely about the house while the protective sweep was conducted.  Further, he was interviewed in a small, closed-door bedroom with two agents practically hovering over him.  Accordingly, while the interview lasted for one hour and thirty-nine minutes, which is typically construed as a non-custodial factor, a

consideration of these other circumstances makes the duration prong tip toward the fact that a custodial interrogation occurred.

### 2.   Voluntary Participation

Second, the Court must determine whether Defendant voluntarily participated in the interview.  This factor has otherwise been phrased as whether the defendant "agreed to meet knowing that he would be questioned about a criminal offense."  Ludwikowski, 944 F.3d at 132.  Here, Defendant did not know the subject of the interrogation until after the interview began.  The Case Agent acknowledged this during the Motion to Suppress Hearing, testifying that while he provided Defendant with the search warrant after the interview began, he did not initially inform him that he was investigating a child pornography crime.  (Interview Tr. at 2:10-13; Doc. No. 92 at 27:4-19, 28:5-7, 11-13.)  Accordingly, Defendant's lack of knowledge as to the subject of the investigation points in favor of a custodial interrogation.

### 3.   Physical Restraint

The third factor is whether Defendant was physically restrained while questioned.  At the time of the interview, Defendant was not physically restrained.  However, the circumstances here rise to a level of physical restraint.  First, Defendant was grabbed and restricted to his living room under the constant supervision of three agents while the protective sweep was conducted.  Second, Defendant was placed in a small bedroom, with the door shut, and in close proximity of two federal agents during his interview.  Physical touching or handcuffing is not required in this setting before restraint is created.  Moreover, Defendant was never told that he was free to leave his home.

Thus, the location and circumstances surrounding the interview are sufficient to establish that Defendant was physically restrained and that he felt he was not free to leave.

4. <u>Officer's Expression of Belief</u>

Fourth, the Court will cover what the officers knew before the interview and the extent to which they made their beliefs known to Defendant.  Under Supreme Court precedent, "an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody . . . ."  <u>Stansbury</u>, 511 U.S. at 325.  Such views are considered "only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave."  <u>Id.</u>; <u>see also</u> <u>Jones</u>, 2011 WL 4011406, at *3 (internal quotations omitted) (quoting <u>Rodriguez</u>, 2010 WL 1485704, at *6) ("[a]dditional factors deemed important by the Third Circuit include what information was known by the officer concerning the suspect's culpability and whether the officer revealed his belief that the suspect was guilty"); <u>id.</u> at *5 ("agents had knowledge of Jones' possible criminal activity, which weighs in favor of finding a custodial interrogation"); <u>Steigler</u>, 496 F.2d at 799-800 (quoting <u>Hall</u>, 421 F.2d at 545) ("[t]he more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers <u>Miranda</u> . . . .").

During the interview, the agents not only repeatedly expressed their collective belief that Defendant was guilty, but also supported this belief with multiple references to substantial evidence.  The agents' statements, listed in full, <u>supra</u> at Section II(c), and repeated here in part, are as follows:

    (1) "Hey, we're asking questions we already know the answers to, what's the name of the Twitter account?"  (Interview Tr. at 4:8-9);

(2)  "[W]e're obviously here for a reason. . . .  We have a lot of questions that we already

know the answers to."  (Id. at 5:34-35, 39);

(3)  "I know you have multiple Twitter accounts.  They open up and shut down . . . ."  (Id.

at 6:11-12);

(4)  "I know your criminal history.  I know you've been through this before.  I know you're

scared.  I know you don't want to go through it again, but unfortunately you went down

that road again.  And that's what brought us here today."  (Id. at 6:19-22);

(5)  "[W]e have the Twitter chats that you're having with people.  We've done search

warrants. . . .  We have the Twitter DM's that you're having with other people."  (Id.

at 7:30-31, 35);

(6)  "We found a guy that you sold to.  I know you use Kik."  (Id. at 7:39);

(7)  "All of the search warrants to Twitter that we did . . . the internet service here is Verizon

and it's in your name, Anton Beasley. . . .  So listen also, all of that comes back to this

address."  (Id. at 8:23-25; 9:1);

(8)  "[W]e have all this information, Anthony. . . .  We don't just bang on the door at 6:30

in the morning without a lot of information."  (Id. at 10:19-20, 22);

(9)  "I do know that you're collecting these links and collecting these files and you're

selling them . . . ."  (Id. at 13:16-17);

"[S]o what we have now is all your accounts on Twitter the boyzcuties accounts on

Twitter, the Tumblr accounts for boyzcuties."  (Id. at 14:21-23);

(10)  "Just be honest.  We know you did [created the boyzcuties accounts]."  (Id. at

20:35);

(11)  "[E]verything in the investigation comes back to you."  (Id. at 22:9-10);

(12) "Listen, if if we found stuff on there today or not doesn't matter. . . . It doesn't matter because we already have a ton of evidence already from Twitter, all those Twitter accounts. You have like seven or eight Twitter accounts, and they – with the – with the search warrants and everything, they provide all of the videos that you already posted on there, we have all that already. We have everything tying it back to you." (Id. at 23:22, 26-30);

(13) "I mean, listen, we all know that's a lie so I wouldn't even say that that's not your computer. That's the last thing you want to do." (Id. at 27:19-20);

(14) "All the three of us here know, hah, me you, and Brian, all know that these are your accounts." (Id. at 29:33-34);

(15) "[W]e know that that's not the truth [in response to Defendant stating he did not engage in these crimes]. We know that the boyzcuties accounts are your accounts." (Id. at 32:21, 31-32);

(16) "That's how it led us here today [Twitter sending the IP addresses] and that's why we know it's you. We don't have to sit here and talk to you. We have everything that we need. But, I just want to give you the opportunity to tell the truth, accept responsibility, and then we can go from there." (Id. at 33:35-38);

(17) "We're not gonna believe you. Just don't even say it [in response to Defendant attempting to allege that someone else was responsible for the offenses]. . . . It is, it is dumb. It's stupid to say that. You're wasting your time and our time by saying that." (Id. at 34:37, 43, 45);

(18) "Yeah. It's extremely pointless. [laughter] I can't think of anything that's more pointless

than to try to lie about this." (<u>Id.</u> at 36:4-5.);

(19) "We know it all Anthony.  We do our homework." (<u>Id.</u> at 37:27);

(20) "How were they [the accounts] somebody else's?  Explain that to me.  Because that's not gonna make sense, cause it's a lie." (<u>Id.</u> at 40:6-7);

(21) "We're taking the computers, the phones.  We're gonna find child porn on em because you have it saved on there.  That's a guarantee.  I know you do." (<u>Id.</u> at 42:11-13);

(22) "In every case, we pretty much have enough evidence to go in and just take everything.  We don't need to talk to people.  You know what I mean?  Like, I don't need to sit here for the past hour talking to you.  You know what I mean?" (<u>Id.</u> at 43:5-8);

(23) "I got no problem saying that those are your accounts cause I know they're your accounts." (<u>Id.</u> at 45:40-42); and

(24) "We have all the evidence to show that they're your accounts." (<u>Id.</u> at 45:46);

(25) "I didn't have to sit here for an hour and a half and, and talk to you.  You know.  We have all the evidence already." (<u>Id.</u> at 55:5-6.)

(26) "It's a given that you did this." (<u>Id.</u> at 57:38.)

In addition to these statements, the agents provided Defendant with documentary evidence showing that he committed the crimes being investigated.  Specifically, they showed him copies of: (1) an online conversation on KIK between Defendant and a person looking to purchase videos depicting child pornography; (2) a payment receipt through PayPal; (3) Defendant sending a link of the purchased video; (4) a Twitter post, containing a clip of a child pornography video, from one of the Boyzcuties accounts; (5) the advertised Twitter video; (6) PayPal records containing Defendant's email address, phone numbers, residential addresses, and credit card number; and (7) a direct message on Twitter in which Defendant discussed his sale of video links and the possibility

of trading links.  (Interview Tr. at 9:15-23; 14:41-42, 44; 15:4-6, 12-13, 23, 27-29, 38-40; 32:38-39, 41, 43, 45; 33:1-2, 18; 42:15-18; 50:1-3.)

Given the number of statements made by the agents unequivocally expressing their belief that Defendant was guilty, in conjunction with the documentary evidence they presented to Defendant, the officer's views and beliefs were clearly "manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." Stansbury, 511 U.S. at 325.  Undoubtedly, a reasonable person in Defendant's situation would have felt that his freedom to leave was severely limited. Under the circumstances here, this factor has a large role in the finding that Defendant was subject to a custodial interrogation.

### 5.   Whether Officers Told Suspect He was Under Arrest or Free to Leave

Fifth, the Court must determine whether the agents told Defendant that he was under arrest or that he was free to leave.

Here, the Defendant was told that he was not free to leave.  (Id. at 70:15-20.)  While the Case Agent testified that had Defendant "indicate[d] that he want[ed] to leave [after the completion of the protective sweep], he would have left" (Id. at 51:3), he also testified that he never explicitly informed Defendant that he was free to leave.  (Id. at 70:15-20.)  This omission points to the conclusion that Defendant was subject to a custodial interrogation.

Regarding whether he was under arrest, although the Case Agent informed Defendant when they entered the bedroom that he was not under arrest, the Court has noted that this statement is questionable given the discussion on the above factors.  The agents did not need an actual arrest warrant prior to taking a person into custody, and the Court has found that the Defendant was in custody while he was being interrogated.

In any event, even though the Case Agent told the Defendant he did not have to answer anything, and did not have to talk to them, this warning is insufficient to comply with <u>Miranda</u>.

### 6. Whether Officers Used Coercive Tactics

Sixth, the Court must look to whether the Case Agent and the Second Agent employed coercive tactics in their questioning. Coercive tactics include "a harsh tone of voice, display of weapons[,] or physical restraint during the interrogation." <u>Killingsworth</u>, 118 F. App'x at 652. Further, the officer's statements themselves can also contribute towards creating a coercive environment. <u>See</u>, <u>e.g.</u>, <u>United Sates v. Perkins</u>, 20221 WL 507480, at *3 (E.D. Pa. Feb. 18, 2022). In <u>Perkins</u>, the court stated:

> In addition to the restrictions on Perkins's movement during the interview, I find that Agent Hefner's comments could have created a coercive environment. Perkins testified to specific threatening statements made by Agent Hefner during the interrogation, in which he stated, "you're going to get 20 years," and "who's the grandy jury going to believe, me or you?" . . . These unrebutted statements could have created the kind of coercive environment <u>Miranda</u> warnings were designed to protect.

<u>Id.</u>

Here, the Case Agent testified that neither he, nor his partner, used coercive tactics. The Court does not agree with this assessment. The word "harsh" may be defined in a number of ways: (1) "overly intense or powerful"; (2) "unpleasant and difficult to accept or experience"; (3) "excessively critical or negative"; or (4) "unduly severe in making demands." Harsh, Merriam-Webster's Dictionary (2023). A "harsh tone of voice" is not synonymous with yelling. The Government relies primarily on this fact by asserting neither agent yelled at Defendant during the interview. The audio recording of the interview transcript confirms this assertion. However, Defendant's reactions to the officer's questioning, which included various periods of crying and stuttering, show that the agents' tone of voice and use of words was "unpleasant and difficult to

accept or experience."  Defendant's reactions and manner of speaking were contrary to those of the defendant's in <u>Ludwikowski</u>, where the court determined that a reasonable person in the defendant's place would have felt that he was free to leave because, in part, the examiner had a "calm demeanor" and provided "calculated answers."  <u>Id.</u> at 35.

In addition, the bedroom was a small, enclosed space, dominated by the presence of law enforcement officers, in which Defendant sat on a bed while the agents stood within a few feet of him.  Further, even though the Case Agent kept his firearm holstered, it would have still been visible.  (<u>Id.</u> at 27:1-2.)  The totality of the statements of the agent created a coercive environment. Most importantly, as in <u>Perkins</u>, the agents made statements expressing their belief that Defendant was guilty and that "something's gonna happen here," "this isn't going to go away," "it doesn't just go away," "probation [was] not an option," "[y]ou're right.  It's impossible [to not get jail time]," "I know you don't want to go back to jail.  Nobody wants to go back to jail," "[i]f convicted, there's no way you're avoiding jail time," and "[e]verything comes back to you." (<u>Id.</u> at 16:20-22; 29:4, 8, 12, 16, 9:27-30; 20-23; 31:29-31, 33; 46:28; 43:27.)

These factors favor a finding that direct and nuanced coercive tactics were used.  This factor further supports a finding of custodial interrogation.

### 7.   Whether the Interviewee was Released

Finally, the Court may also consider "the release of the interviewee at the end of the questioning." <u>Howes</u>, 565 U.S. at 509.  In this case, Defendant was arrested immediately following his interview, (Doc. No. 92 at 38:6-14), providing support for a finding that he was in custody throughout the interrogation.

D.  Whether the Freedom-of-Movement Test Presents the Same Inherently Coercive Pressures as Miranda

The final of the analysis step set forth in J.D.B. requires a court to consider whether "the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda."  Ludwikowski, 944 F.3d at 132 (citing United States v. Jacobs, 431 F.3d 99, 105-06 (3d Cir. 2005)) (internal quotation marks omitted).  The court must consider this step because "the freedom-of-movement test delineated by these factors [those analyzed above] identifies only a necessary and not a sufficient condition for Miranda custody."  Id. (citing Howes, 565 U.S. at 509 (quoting Shatzer, 559 U.S. at 112)) (internal quotation marks omitted).

Here, for all the foregoing reasons, Defendant was subject to an environment that presented the same inherently coercive pressures as the type of station house questioning at issue in Miranda. In sum, Defendant was: (1) the target of a criminal investigation; (2) under constant supervision; (3) interviewed in a closed-door, small bedroom, in the presence of two armed federal agents; and (4) questioned by agents who knew that he was not free to leave and who in a nuanced way brushed aside Defendant's request to consult with counsel; and (5) arrested him at the conclusion of the interview.

In determining whether a person is in custody, it is evident that a court must delve into the factual circumstances with as much precision as possible.  The Court has done so here.  And although the statements by a defendant can influence greatly the outcome of a case, the law on custodial interrogation and the requirements of Miranda must be followed.  Giving Miranda warnings to persons in custody has been part of our jurisprudence for seventy years since Miranda was decided, and it would have been easy to do so here.  When the warnings are not given to a person in custody, the law compels that the prosecution may not use the statements against a defendant.  Accordingly, here, Defendant's statements will be suppressed.  And while the

resolution of the <u>Miranda</u> inquiry is dispositive of Defendant's Motion, the Court will still address Defendant's remaining two arguments: (1) Defendant's constitutional right to counsel was violated and (2) Defendant's statement was a product of coercion by law enforcement.

     E.  <u>Constitutional Right to Counsel</u>

     Defendant next moves to suppress his statements by arguing that Defendant asserted his right to counsel and that "[t]he Agents violated [this right] . . . in that, having requested counsel, Mr. Beasley was not to be subjected to further interrogation until counsel had been made available to him." (Doc. Nos. 70 at 5-6; 97 at 13-15.)  By contrast, the Government argues that while Defendant referenced an attorney, the references did "not warrant suppression as it [did] not amount to an invocation" of the right to counsel and instead was "equivocal and ambiguous," meaning that the agents were allowed to proceed with questioning Defendant. (Doc. No. 80 at 10-11.)

     To properly invoke one's right to an attorney, the individual must make a statement that "at a minimum . . . can reasonably be construed to be an expression of a desire for the assistance of an attorney." <u>Davis v. United States</u>, 512 U.S. 452, 458 (1994) (citing <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 178 (1991)); <u>id.</u> at 459 ("[T]he suspect must unambiguously request counsel. . . 'he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'")  By contrast, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect <u>might</u> be invoking the right to counsel," investigators may continue their questioning.  <u>Id.</u> at 459 (emphasis in original); <u>id.</u> at 452 (affirming the lower courts' conclusion that "[m]aybe I should talk to a lawyer" did not constitute a request for counsel).

Importantly, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." Edwards v. Arizona, 451 U.S. 477, 484 (1981); see also Alston v. Redman, 34 F.3d 1237, 1243 ("once a suspect has asked for the assistance of counsel, it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures [of custodial interrogation] and not the purely voluntary choice of the suspect") (internal quotation marks and citations omitted). However, if a suspect has invoked the right, one may still be subject to questioning if one then (1) "initiate[s] the conversation with the authorities" and (2) the waiver . . . [is] knowing and voluntary." United States v. Velasquez, 885 F.2d 1076, 1084 (3d Cir. 1989) (citing Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983)). The first factor, initiation of the conversation by the defendant, was defined by a Supreme Court plurality in Oregon v. Bradshaw as an inquiry which "evinced a willingness and a desire for a generalized discussion about the investigation." Bradshaw, 462 U.S. at 1046. A suspect's question of "[w]hat is going to happen?" was found to be an initiation and "not merely a routine inquiry incidental to her custodial relationship." Velasquez, 885 F.2d at 1085.

A "valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." Miranda, 384 U.S. at 475. However, "[a]n express written or oral statement of waiver . . . is not inevitably either necessary or sufficient to establish waiver" and "in at least some cases[,] waiver can be clearly inferred form the actions and words of the person interrogated." Butler, 441 U.S. at 373. The

prosecution is required to prove waiver by a preponderance of the evidence.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986) (citations omitted).

Here, Defendant invoked his right to an attorney.  He did not waive this right, and the prosecution did not prove waiver by a preponderance of the evidence.

As noted earlier, Defendant attempted to invoke his right to counsel seven times.  Again, those statements are as follows:

1.  "I need a lawyer or something because this is, this is crazy."  (Interview Tr. at 8:15-16)

2.  "I gotta see somebody before I answer any questions."  (<u>Id.</u> at 20:4)

3.  "I, gotta, I gotta, I gotta talk to somebody."  (<u>Id.</u> at 27:15-16)

4.  "I have, I have to, I have to talk to a lawyer."  (<u>Id.</u> at 55:22)

5.  "I have to talk to somebody."  (<u>Id.</u> at 56:8-9)

6.  "I gotta talk to somebody, I gotta, I wanna take the fifth.  I gotta talk to a lawyer. . . .  I gotta talk to the federal, some kind of lawyer or something."  (<u>Id.</u> at 59:24-25, 29)

7.  "I have to talk to a lawyer."  (<u>Id.</u> at 61:2)

Defendant's first statement, "I need a lawyer or something because this is crazy," properly invoked his right to an attorney.  While he added "or something" to this statement, this latter phrase does not negate the clarity of the statement.  Also, as noted earlier, it would be clear to these experienced agents that Defendant's references to "somebody" would be for a lawyer.  Again, for one to raise his or her right to legal counsel, one must request counsel clearly and unequivocally, in a manner that would cause a reasonable officer in the same circumstances to recognize the statement as such a request.  Defendant's statements are not ambiguous, and the agents as reasonable officers should have recognized the statements as a request for counsel.

Furthermore, Defendant did not waive his right to counsel.  First, after Defendant made this request for an attorney, the Case Agent followed with: "This is crazy?"  (Interview Tr. at 8:18.)  Then, Defendant asked "[h]ow y'all link?  All this.  I don't understand how you link that to here."  (Doc. No. 92 at 35:2-9; Interview Tr. at 8:20-21.)  This statement was in response to the Case Agent's own question.  As stated earlier, "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  Edwards v. Arizona, 451 U.S. 477, 484 (1981); see also Alston v. Redman, 34 F.3d 1237, 1243 ("once a suspect has asked for the assistance of counsel, it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the inherently compelling pressures [of custodial interrogation] and not the purely voluntary choice of the suspect") (internal quotation marks and citations omitted).  The Court construes Defendant's subsequent statement not as a waiver of his rights by means of initiating further conversation, but instead as a response to "further police-initiated custodial interrogation."

Additionally, Defendant did not act voluntarily or knowingly.  This is supported by two facts: (1) Defendant was never given Miranda warnings at the outset of the interview and (2) Defendant invoked his right to counsel seven times during the interview.  Therefore, Defendant's constitutional right to counsel was violated and his statements should be suppressed.

F.  Coercion

Lastly, Defendant argues that his statements to the FBI should be suppressed because "the circumstances under which his statement was extracted were coercive in nature."  (Doc. Nos. 70 at 6; 97 at 15-17.)  Defendant highlights the following facts in support of this assertion: (1) the

search was conducted "very early in the morning"; (2) Defendant was "clearly overwhelmed by the number of law enforcement officers"; (3) "there was absolutely no need to question the Defendant"; and (4) Defendant was not given <u>Miranda</u> warnings and his requests for counsel were ignored.  (Doc. Nos. 70 at 6; 97 at 15-16.)  In his Supplemental Memorandum, Defendant also includes the following facts: (1) Defendant "was under guard by the Agents at all times"; (2) Defendant was "questioned by two armed FBI Agents, alone in a bedroom with the door closed, for one hour, 39 minutes and 12 seconds"; (3) Defendant "was the target of the investigation"; (4) Defendant did not eat, drink, or use the restroom; (5) Defendant was "distraught" and made several statements to this effect; (6) Defendant was "misled" when asked about the next steps of the investigation; (7) Defendant was never told "that he was free to leave the premises at any time while the Agents were present"; and (8) Defendant was "constantly advised by the Agents that they knew what he had done . . . ."  (Doc. No. 97 at 6-8, 15-16.)  The Government disputes this argument, contending that the statements were voluntary and not the product of coercive actions. (Doc. No. 80 at 12.)

"[T]o sustain a coercion claim in an effort to have his confession excluded from admission into evidence at trial, a criminal defendant must point to some link between police misconduct and the confession."  <u>Halsey v. Pfeiffer</u>, 750 F.3d 273, 303 (3d Cir. 2014) (citing <u>United States v. Jacobs</u>, 431 F.3d 99, 108 (3d Cir. 2005)).  A court is to "'consider the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the accused.'"  <u>Halsey</u>, 750 F.3d at 303 (citing <u>Miller v. Fenton</u>, 796 F.2d 598, 604 (3d Cir. 1986)). This inquiry further boils down to analyzing, among other factors, the following:

> the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep.

Id.  The Third Circuit has made it clear that "the ultimate question is 'whether the defendant's will was overborne when he confessed.'"  Id. at 304 (citing Miller, 796 F.2d at 604).

Here, the environment in which Defendant was interrogated was coercive in nature.  Again, the coercion analysis requires a court to "consider the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the accused.'"  Halsey, 750 F.3d at 303 (citing Miller v. Fenton, 796 F.2d 598, 604 (3d Cir. 1986)).  Coercion may be accomplished by a variety of harsh inducements, which can be direct, indirect, or nuanced.

The parties do not provide any facts about Defendant's age or level of education.  However, for the reasons stated above in the custodial interrogation analysis, the other circumstances surrounding the interview made it coercive.  First, Defendant was deprived of "advice [as to] . . . his constitutional rights."  He was not provided with Miranda warnings nor was his invocation of the right to counsel honored.  Further, when Defendant stated that he would like an attorney but could not afford one, neither agent informed Defendant that he had the right to have an attorney appointed for him.  Second, as Defendant argues, he was the target of the investigation, as he was identified in the affidavit submitted to the Magistrate Judge to obtain a search warrant to search Defendant's home.  And the agents even confirmed that the interview was not necessary, by stating, for example: (1) "[w]e don't have to sit here and talk to you.  We have everything that we need" (Id. at 33:35-36); (2) "[i]n every case, we pretty much have enough evidence to go in and just take everything.  We don't need to talk to people.  You know what I mean? Like, I don't need to sit here for the past hour talking to you. You know what I mean?" (id. at 43:5-8); and (3) "I didn't have to sit here for an hour and a half and, and talk to you.  You know.  We have all the evidence already." (Id. at 55:5-6.)  Third, as noted several times, the environment of the interview was coercive, as Defendant was interrogated in a small, closed-door bedroom in the presence of

two armed federal agents.  The agents continually prodded Defendant with questions for one hour and thirty-nine minutes.  They also repeatedly urged him to tell the truth and to be honest, which included warning Defendant that if he lied to them, he could be sent to prison for five years, and also noting that if he told the truth, the prosecutor and judge would look favorably upon him.

Fourth, Defendant was under constant supervision before, and during, the interview and was never told that he was free to leave.  Fifth, the agents repeatedly told Defendant that they knew he was guilty and presented him with substantial evidence in support of their beliefs.  Sixth, while the Special Agents did not arrest Defendant until the end of his interview, they told him, among other things, that "something's gonna happen here," "this isn't going to go away," "it doesn't just go away," "probation [was] not an option," "[y]ou're right. It's impossible [to not get jail time], and that "[i]f convicted, there's no way you're avoiding jail time."  (Id. at 16:20-22; 29:4, 8, 12, 16, 20-23; 31:29-31, 33; 46:28.)  Seventh, Defendant repeatedly expressed signs of emotional distress, cried during the interview, and also perceived the interview as the agents' attempt to secure a confession.  Defendant said: (1) "[y]'all basically here to get, get a confession from me. That's basically what this is" (id. at 42:40-41); (2) "[s]o basically, so basically you all just hearing me, y'all just want me, y'all need a confession on tape" (id. at 44:7-8); (3) "[s]o, that's the only, that's actually what y'all waiting for, for me to confess" (id. at 44:43); and (4) "[s]o, that's what you waiting, y'all just waiting, y'all just want me to confess that all the accounts are mine."  (Id. at 58:26-27.)  Eighth, Defendant was arrested shortly after the interview concluded when the Case Agent spoke with the U.S. Attorney's Office.  For all these reasons, and those discussed throughout this Opinion, Defendant's "will was overborne when he confessed," and his statement will be suppressed.

**IV.     CONCLUSION**

For the foregoing reasons, Defendant's Motion to Suppress [His] Statement (Doc. No. 70) will be granted.  An appropriate Order follows.